(82 South. 885)

No. 21446.

Succession of SAUR v. SAUR.

(June 30, 1919.   Rehearing Denied Oct. .14, 1919.)

*(Syllabus by Editorial Staff.)*

EXECUTORS AND ADMINISTRATORS ☞85(5¼)— SUCCESSION — HEIR'S LIABILITY TO ESTATE ESTABLISHED BY EVIDENCE.

In an action by an executor to recover from the daughter of the testatrix the amount of a check, evidence *held* to establish that the daughter was not entitled to the proceeds of the check which she claimed was due her for earnings delivered to her mother.

Appeal from Civil District Court, Parish of Orleans; Porter Parker, Judge.

In the matter of the succession of Mrs. Caroline Saur. Action by Edward. J. Heintz, executor, against Miss Julia Saur. From a judgment for defendant, the executor appeals. ·Reversed, and judgment for the executor directed.

Louis Henry Burns, of New Orleans (Suthon & Loomis, of New Orleans, of counsel), for appellant Edward J. Heintz, executor.

George B. Smart, of New Orleans, for appellants Mrs. David and Frederick Saur.

Woodville & Woodville, of New Orleans, for· appellee Miss Julia Saur.

PROVOSTY, J.   The mother of defendant,. on her deathbed (she died four days later), received a check for $2,539.10 (the price of a piece of real estate), and handed it to defendant for collection. The present suit is brought by the testamentary executor of the mother to recover the amount of defendant.

Defendant's first explanation was that her mother had made her a present of the money; and she stated that she had put a part of it in bank, and with another part had bought homestead stock.

This did not accord well with a certain clause in the testament of her mother, made on the 14th, the day the check was given defendant for collection. This clause reads:

"I give and bequeath to my daughter, Julia Saur, all the household effects in my home, 2121 Annunciation street; also my jewelry and the sum of five hundred dollars, the above to be over and above her share, the legacy being made to Julia because I have received from her at various times sums of money equal to that amount, as well as receiving her services to me during my sickness."

At the taking of the inventory, defendant abandoned the theory of her mother having given her the money, and stated that she had delivered the money to her mother, who had kept it.

No money was found in the house after the death of the mother; and defendant and her sister Mrs. Norsacka, who had been their mother's constant attendants during her ill-

ness, advanced the theory that the moribund old lady must have hidden the money somewhere so that it could not be found; that it was her habit to hide money.

This hiding of money does not accord very well with the dying condition of the old lady, or with her leaving this world without having revealed the hiding place, and accords still less with the fact that defendant did not receive from the bank the whole amount of the check in cash, but received a certificate of deposit for the greater part.

The amount received in cash was $1,000; and on that same day, before going back home, defendant bought, and paid cash for, $1,000 of homestead stock.

She explains that this $1,000 was her own money; part of $2,115, turned over to her by her mother, in cash, on that same day at the time of handing her the check for collection; that this $2,115 thus handed to her by her mother was her (defendant's) savings, which the mother had always kept. Neither defendant nor her sister explain from what place in the house the old lady got this large sum of money to hand over to defendant.

In accounting for these savings, defendant testified that—

Beginning at the age of 10 she worked at $4 a week for "about six or eight months"; then at $4.50, for "about five months;" then at $5 for eight months; then at $5, until she left this first place of employment, where, she says, she remained about 1½ years. Then she went to another place, where she got "five and a half or six dollars" a week. However, after eight months at her first place of employment, which was a millinery shop, she had "learned" her "trade" (being then, it will be observed, in her eleventh year), and earned money by trimming hats at home in her spare time. At the second place of employment she got "five and a half, I think." "Q. Can you give us the names of some of these people for whom you made hats? A. Well, they have been old neighbors. I cannot recollect everybody who lived in the neighborhood, because they moved in and moved out. Q. Certainly you could give us the name of one or two. A. I could give you the names

of people who lived there, but that has been years ago. Q. We would like to have the names of some of those people who employed you. A. If you give me time to think on it, but I cannot think of everything at one time. They moved in and moved out of the neighborhood— " And defendant gave no names. She went to her next place of employment when "a little over eleven. Worked there a year at $5.50 a week." Then entered employment at another place "as a milliner," at $6 a week, and remained six months. Then was attending a sick sister for a month and a half; and, "going on thirteen," entered her next employment, which was at $7 a week, and remained there four years. While there she would get a percentage on sales. "When we got a customer and sold to a customer, we got one-third of the profit on that sale; and everything I sold I got good money. I remember one time I made $12 on selling two ostrich plumes." After that she worked in a restaurant for eight months at $8 a week. Then in another restaurant at $8.50 and board for five months; and then in this same restaurant for nine months as cashier at $12 a week. This was up to her mother's death. Paid her mother $3.50 a week for board from the time she began work. "Q. How about your clothes? A. My clothes? My sister would give clothes to me. If there was a waist she didn't want, I wore it. I can show you clothes right now at home that she has given me. Q. You never bought any clothes? A. No, sir; I never bought any clothes. I bought a very few waists, and if I bought any waists they were very cheap waists at the time. My sister Mrs. Norsacka gave me clothes." She never kept any memorandum of her savings, but would simply hand them over to her mother, saying, "Put this away, Mama." This $2,115, she says, was all the money her mother ever had for her.

Plaintiff's counsel has made a computation showing that these earnings of defendant, less the $3.50 a week for board, would not foot up $2,115. We spare ourselves the trouble of going into that, as we consider that the hereinabove transcribed clause in the mother's will—to the effect that the legacy of $500 to defendant was "because I have received from her at various times sums of money equal to that amount" — when taken in connection with defendant's statements that her mother never had any

other money for her than the $2,115, shows that this $2,115 story is a pure invention.

After this, and after defendant's shifts in attempting to account for the proceeds of the check, it would take more than the corroborating testimony of defendant's two sisters to make a court believe the story. These two sisters and defendant agree to a nicety in their account of the giving over of the $2,115 by the mother to defendant, but one of them, Mrs. Norsacka, cannot remember how many days it was before the making of the will.

Mrs. Norsacka was summoned to her mother's bedside from her home in the parish of Catahoula. She arrived in New Orleans on Monday, the 13th. The will was made on the next day, the 14th. The defendant testified that the money was given her by her mother on the 14th. Now, Mrs. Norsacka testified as follows:

"Q. You say you remember the day your mother made the will. Was that statement made before or after she made the will?

"A. About what?

"Q. That statement you just referred to made by your mother in regard to Julia's money?

"A. Before she made the will.

"Q. How long before?

"A. Well, I don't know, sir.

"Q. How many days before?

"A. I don't know, sir.

"Q. It was more than a day, wasn't it?

"A. Oh, I expect so; probably a few days,

"Q. It might have been more than three days?

"A. Probably so.

"Q. Are you positive about that?

"A. Yes, sir."

The total assets of the succession amounted to only $7,103.20. It was made at the home of the decedent, and the three daughters were present. If it was true that four days previously the defendant had turned over $2,539.10 to the mother in cash, they knew that fact, and they knew that that sum had not been inventoried; in fact, had not been found, or even mentioned.

"By Mr. Smart:

"Q. Mrs. Fabacher, who was it first brought up the question of the $2,500, after the taking of the inventory?

"A. Who was it?

"Q. Who was it first mentioned the $2,500—the fact that there was $2,500—that was in the house and apparently missing? Did you or your sisters mention it to the notary?

"A. No, sir; none of us mentioned it to any notary.

"Q. You knew you were an heir and your mother had received $2,500 a few days before her death?

"A. Yes, sir.

"Q. And on the taking of the inventory, you, your sister, nor Mrs. Norsacka ever mentioned it?

"A. No, sir; never gave it a thought.

"By Mr. Smart:

"Q. As a matter of fact, did I not first propound the question at the inventory; what has become of that $2,500?

"By the Court:

"What difference does that make who propounded the question.

"By Mr. Smart:

"The difference is I want to show that these persons who were in charge of the house paid no attention to the absence of it, or thought of it, or gave any information to the notary until after he completed taking the inventory."

The inventory was made, and the question of what had become of this $2,539.10 was begun to be agitated on that day after the inventory had been made. On the following Monday, defendant and her lawyer called at the office of the Homestead Association, and withdrew, or cashed, the $1,000 homestead stock, and withdrew $1,000 from the bank of the $1,500 represented by the deposit certificate; and defendant turned this money over to her lawyer. Why this was done, unless, perhaps, in apprehension of a suit like the present, is not explained.

Further comment is, we think, entirely unnecessary. After the review of the matter made by the court when the same facts were before this court in another connection on a previous occasion (Succession of Wingertner, 133 La. 876, 63 South. 387), we might have spared ourselves the trouble of any com-

ment at all; the bare facts speaking for themselves.

The judgment appealed from is set aside; and it is now ordered, adjudged, and decreed that the plaintiff Edward J. Heintz, executor of the succession of Mrs. Caroline Wingertner Saur, have judgment, in his said capacity, against the defendant Julia Saur, in the sum of $2,539.10 with 5 per cent. per annum interest thereon from November 15, 1911, and that the said defendant pay the costs of this suit.